**EXHIBIT "B"**

To the Honorable Judge of the

Court in First Instance of Sint Maarten

# APPLICATION FOR DISSOLUTION and DAMAGES

The Court is respectfully notified by:

1. The public company **ZEBEC DEVELOPMENT N.V.**, with its registered office in Sint Maarten, and

2. the company under foreign law **VALUTA HOLDING LTD.,** with its registered office in Anguilla, the applicants, hereafter: "Zebec" (male, singular), choosing as address for service in this matter the offices of Lexwell Advocaten, at Falcon Drive, Harbour View, Philipsburg, Sint Maarten, of which firm J. Veen and W.J. Nelissen are authorized to represent the applicants in this matter and specifically also to draft, sign and file this application;

This application is directed at:

1. The company **SINT MAARTEN HARBOUR CRUISE FACILITIES N.V.**, the defendant, hereafter: "the Port", with its registered office in Sint Maarten at J. Yrausquin Boulevard, Harbour Village Suite #13A, in Point Blanche, Sint Maarten; and

2. Mr.**MARK TIMOTHY MINGO**, the defendant, hereafter: "Mingo", resident of Sint Maarten at Clam Shell Drive #11, Ocean View Terrace, Dawn Beach.

On grounds of the following reasons:

---

1. Zebec owns the right of subleasehold described in the measurement certificate SXM UPQ 125/2011 (with a surface area of 12,967 square meters) located in the Cruise terminal in Philipsburg (**exhibit 1; EXHIBIT BINDER #2, D5**). Since mid-2010 Zebec has been working with the Port to develop the "Harbour Village" project on this piece of land. A recent photograph of the undeveloped site is submitted as **exhibit 2** (**EXHIBIT BINDER #2, A1)**; a mock-up of how the project should eventually look is submitted as **exhibit3 (EXHIBIT BINDER #2, A2).** At this point, more than four years on, not a single brick has yet been laid. The project was first called "Dutch Village" and later given the name "Harbour Village". Both names will be used interchangeably in this application.

2. Despite repeated urgings by Zebec, the Port has refused for some time to give Zebec access to its plot of land in order to be able to start construction. Despite the fact that several



agreements have since been concluded and despite the fact that several architectural firms have since supplied (construction) drawings, the Port has refused to cooperate for a long time. Based on the most recent agreement between the parties, the Port must approve the project so that actual construction can begin. This approval has wrongly still not been granted, after almost one year.

3.   Zebec no longer has any confidence in the Port and believes that (fruitful) cooperation is no longer possible. For this reason, Zebec asks Your Court to dissolve the agreements between the parties and order the Port to compensate Zebec's damage.

4.   Before setting out the exact complaints, it is important that the (long) prior history first be adequately explained. This prior history is characteristic of the relationship between the parties and illustrates clearly that the Port is happy to make promises but does not like to follow through on these.

**Introduction**

5.   The dispute at hand arose because the Port did not adhere to agreements with Zebec on the development of a distinctive retail and hospitality project at the cruise terminal on Sint Maarten, "The Harbour Village". Zebec went to a great deal of trouble and invested millions of dollars in the project design and the architectural design and elaboration thereof, only to have to ascertain after several years that the Port has in fact done everything it could to, again and again, avoid giving its final approval for the actual start of the project.

6.   Even worse, from the start the Port has taken on obligations that it would be unable to satisfy and it itself has not made any real efforts whatsoever to ensure the matter progressed smoothly as yet. Zebec has always had to take the initiative in this respect.

7.   Since the Port repeatedly stipulates new requirements or asks for documents it received long ago, the frustration ultimately escalated to such an extent that Zebec sent the Port a demand to confirm that the project can now finally be started. When the Port responded to this with the incomprehensible request that documents that had already been submitted be once again submitted for review, Zebec concluded that the Port is failing attributably in compliance with its obligations and then decided to demand the dissolution of the agreements, as well as damage compensation, in these proceedings.

8.   Zebec has compiled a great many exhibits with which it can support all its factual assertions. These exhibits far exceed the average number of documents in a civil court case. There are very, very many documents. They were delivered to the Court in a box along with a detailed description of the contents. This box also contains a timeline document which can be used on the occasion of arguments in this case.



9.    The original drawings (including all the detailed technical drawings) have been filed with civil-law notary Boekhoudt, in order to on the one hand prove that they exist and on the other prevent the Port - for the time being - from itself using these drawings to go ahead and develop the project or parts thereof. This fear is justified since, even very recently, the Port has itself built stores (at record pace) which it has leased to businesses which were actually planning to lease property in Harbour Village. In addition, there are many witnesses who can give statements on relevant facts that will come up for discussion in these proceedings.

10.   It will ultimately be clear that the Port is an entirely unreliable, chaotic and poorly managed undertaking. Mr. Mark Mingo, the CEO of the Port, is therefore also personally liable because of his directing role in this dispute. Not only has he managed to cause the Port to enter into agreements which he knew it would be unable to comply with, but he also, after Zebec made a number of concessions, once again ensured that the Port failed to comply with its obligations in respect of Zebec.

**Exhibits**

11.   As already announced, Zebec is submitting a substantial number of exhibits in this case. In addition to architectural drawings and designs, a great deal of correspondence is being submitted and a (great) number of agreements are relevant for the dispute.

12.   In order to be able to give Your Court some overview, Zebec has submitted four (4) ring binders (numbered EXHIBIT BINDER #1 to #4), each of which contains a specific part of the exhibits. At the front of these binders is an index that (as expected) refers to the further contents per numbered tab.

*EXHIBIT BINDER #1*

13.   EXHIBIT BINDER #1 contains a chronological overview of the various design phases and relevant drawings. The documents mentioned in the index followed by a Roman numeral I refer to the designs and drawings submitted in large sizes. All these documents are contained in the box entitled EXHIBIT BOX #1.

14.   The documents mentioned in the index followed by a Roman numeral II refer to the (predominantly) technical documents which have been filed with civil-law notary Boekhoudt for inspection. These latter documents are very sensitive and extremely expensive intellectual property and cannot be submitted in their entirety for this reason.

15.   The Port (or any other party) could use these technical drawings to build the project itself. The most time-consuming and expensive conceptual, drafting and calculation work has already



been done. This includes structural analyses of all possible individual parts of the buildings in relation to seismic activity, for instance (see: EXHIBIT BINDER #1, TAB 21).

*EXHIBIT BINDER #2*

16.   EXHIBIT BINDER #2 contains a chronological overview of the correspondence between the parties. This binder is divided into parts A, B, C and D. Tab A is a matrix overview of the various pieces of correspondence between the parties and provides a brief description of the particular document in addition to the specific date. The matrix also indicates where the documents themselves can be found in this binder.

17.   Tab B (numbered consecutively from B1 to B31) contains the correspondence from the start of the negotiations through to September 25, 2012. Tab C (consecutively numbered from C1 to C27) contains the correspondence from October 2012 until the moment this application was filed.

18.   Tab D (D1 to D5) contains the official agreements in which the legal relationship between the parties was created. For example, D1 is the original Memorandum of Understanding between the parties, D4 is the Development Agreement ultimately agreed on and D5 is the Sub-Lease which is referred to above in point 1 as exhibit 1.

*EXHIBIT BINDERS #3 and #4*

19.   EXHIBIT BINDERS #3 and #4 contain all the relevant documents relating to the actual operation of the project. These documents serve as the basis for, among other things, the demonstration of the damage consisting of lost profits (Article 6:96 of the Dutch Civil Code).

20.   EXHIBIT BINDER #3 contains, for instance, the Letters of Intent from interested parties (potential lessees) and the leases which by now have been terminated as a result of the imputable acts by the Port.

21.   EXHIBIT BINDER #4 contains the leases which are still in effect as of the moment this application was filed. With reference to these leases Zebec can demonstrate what damage it suffers in terms of lost profits.

22.   It will also have to be determined with reference to these leases what possible claims the lessees (third parties) may still file against Zebec, which will also ultimately have to be compensated by the Port.

*Bound drawings*

23.   In addition to the four binders discussed above, Zebec has submitted some eleven documents bound using a so-called spiral binding. These documents are listed in the index to EXHIBIT



BINDER #1 but do not each have their own tab in that binder. As Your Court can see, these are mostly drawings in A3-size format. These drawings were made by the architects that Zebec engaged for the project and show the development of the project.

*Method of citing exhibits*

24. A reference has already been made above (in point 1) to an exhibit in one of these binders. The Sub-Lease (exhibit 1; EXHIBIT BINDER #2, D5) is exhibit 1and can be found in EXHIBIT BINDER #2 in tab D5. Where possible, this is how reference will be made to exhibits.

25. Where reference is made specifically to the drawings submitted (in A3 format and bound using a spiral binding), both the exhibit number and the corresponding document code (top right corner) will be given. For the sake of illustration, the very first drawings for the project have the code **PRJ-01**.

26. It was decided to use this manner of submitting exhibits in order to be able to outline as complete a picture as possible immediately with the application, in accordance with Zebec's obligation to provide complete and truthful information and its obligation to substantiate its claims. Everything has been organized in binders as much as possible in order to make Your Court's verification of the pieces of evidence as easy as possible.

**Background, facts and history**

27. In 2009 the Port, the contractor Windward Roads and an association of retailers of Indian descent, the "Indian Merchants", started a project to develop an empty piece of land in the cruise terminal. This was the very first beginning of what would ultimately become the Harbour Village project.

28. At the urgings of the Port, it was decided to work with KERN Architecten (which firm also drafted the first plan). In June 2009 this firm presented its first set of sketches, with which the Port was particularly pleased at the time (**exhibit 4;EXHIBIT BINDER #1, TAB 2 (PRJ-01)**). On account of the economic crisis, the partners in the discussion at the time were unable to realize the project and the Port contacted Zebec.

29. Zebec Development N.V. is part of the Sint Maarten-based family business run by the Gioia family, with a rich history and more than 40 years of experience in construction. The family business was originally established in Venezuela, where it was involved in the execution of large government projects such as the construction of roads, airports, seaports and hospitals. Later, after becoming established on Sint Maarten in 1988, the company was involved in the construction of the Monte Vista project in Pointe Blanche (parceling out of land and luxury homes), the expansion of the Oyster Pond Hotel (9,000 m2) and the renovation and new construction of the Divi Little Bay Hotel.



30. More recently the company has focused on the development of luxury residential and retail projects that have all been successfully completed. These past projects include the construction of 12 individual villas in Oyster Pond (USD 16 million), 16 luxury apartments in the Atlantica Beach Club in Dawn Beach (USD 6 million), the 19 luxury apartments of the Cocos Beach Club on the beach of Simpson Bay (USD 9 million) and the extremely luxurious Las Arenas Beach Condo project in Simpson Bay, consisting of 12 apartments (USD 10 million). Finally, the company developed and built the 50,000 m2 retail area of the 70-million-dollar Blue Mall, which also includes 38 luxury apartments. At the moment, 29 seaside apartments in the Seneca project in Point Blanche (USD 11 million) are still under construction. It also has a large commercial real estate portfolio consisting of more than 200,000 m2 in commercial top locations that are leased to prestigious businesses.

31. The Gioia family has an impeccable reputation with local and international banks as well as with the government and with renowned architects, engineers and contractors with whom they have worked over the years in order to realize their impressive projects. It is an extremely professional undertaking and probably the only project developer on Sint Maarten capable of financing and successfully developing a project of the size of the "Harbour Village".

32. Zebec took over the drawings for the project from KERN Architecten and expanded these. After a private tendering procedure during which Zebec presented the Port with several plans, Zebec was given the contract for the project. The fact that Zebec would take care of 100% of the financing and the Port would share in the profit was most likely also a deciding factor.

33. After a few months of negotiations, on September 20, 2010 Zebec and the Port signed a Memorandum of Understanding ("the MOU") (**exhibit 5; EXHIBIT BINDER #2, D1**), which, despite its title, must be regarded as a 'regular' agreement. Essence prevails over appearances, after all.

34. The aim of the MOU was a project consisting of "*a historical Dutch village style shopping mall with sixteen (16) stores and a commercial area of up to two and a half (2½) stories in height (excluding the windmill and museum building), a newly designed waterfront restaurant development and other tourist attractions and services and other elements (the "Project").*" The agreed surface area of the Project was 14,000 m2.

35. The applicant named in 2, EFB Properties N.V. (also part of the Gioia family business) was a party to this agreement in its capacity as owner of a number of ground leases on strategically located plots in the container terminal. The Port wanted to acquire these plots. In execution of the aforementioned aim (see 35), the parties agreed that EFB Properties N.V. would transfer its ground leases on the plots 23/1969, 253/1969 and 40/1966 to the Port. In an email to Zebec



dated Friday, May 14, 2010 Mark Mingo wrote, on behalf of the Port, that this was a "*vital part of the agreement*" (**exhibit 6; EXHIBIT BINDER #2, B1**).

36. In exchange for this, and after payment of an "Initial Fee" in the amount of USD 1.5 million (one and a half million US dollars) to the Port, Zebec received its right of subleasehold as mentioned above (see: exhibit 1; EXHIBIT BINDER #2, D5) and it got the right to develop and operate the Project.

*The MOU*

37. The intention was that the right of subleasehold already mentioned above would be issued on the basis of the MOU. A Development Agreement would also be signed - more about this below.

38. In particular the first clause of the MOU, which relates to the right of subleasehold, is typical of the agreements between the parties. This clause - almost three pages long - indicates very clearly under what conditions Zebec can develop the Project. Because this clause constitutes the essence of the agreement, it is cited here in its entirety:

*1.The Sub-Lease*

*SMH Cruise agrees to enter into the Sub-Lease with the Project Company.*

*(i)   The Sub-Lease:*

*1.   shall establish that the Project Company pays to SMH Cruise an 'Initial Fee" of one million five hundred thousand United States dollars (USD 1,500,00.00) at the granting of the Sub-Lease;*

*2.   shall encompass the Development Land unencumbered and free from all debt;*

*3.   shall be for 25 years (the "Lease Term"), with an option for either SMH Cruise or the Project Company to extend the Sub-Lease for a period not exceeding 25 years (the "Option Term");*

*4.   shall establish the "Sub-Lease Rent" (ground rent) payable to SMH Cruise in addition to the Initial Fee (i) at an amount equal to 10% until 2017, 20% as of 2018 and 30% as of 2022 until the end of the Lease Term, of the "Net Retail Rents" collected from tenants of units in the Project, annually in arrears, to be established through audited rental statements from the Project Company with a guaranteed annual minimum of three hundred thousand United States dollars (USD 300,000.00) in each year in which at least 1,050,000 cruise passengers shall have arrived at the Port on board of cruiseships.Net Retail Rents is defined as Gross Rents less administration costs equal to 25% of Gross Rents.Gross Rents are all amounts collected from or for (the use of) the Project or parts thereof (fixed or variable, pre-paid or not), which include all items that on the balance sheet of the Project Company would have to be classified as "gross revenues", but excludes taxes.Increases to the Sub-Lease Rent shall be determined based on the "Projected Cash Flow Statement" attached as EXHIBIT B or as otherwise*



*agreed by the Parties; and (ii) during the Option Term at an amount per year as determined between SMH Cruise and the Project in good faith and taking all economic conditions into account, which amount shall however never be less than the amount that was payable for the last year of the Lease Term;*

5. *shall contain all provisions reasonably required by Zebec to effectuate the construction, development and use of the Project;*

6. *will contain customary provisions necessary to allow the Project Company to obtain leasehold financing for the Project and, upon request by the Project Company, SMH Cruise shall make commercially reasonable efforts to obtain and deliver all approvals and consents that are legally required –if any- from the* ==fee simple owner== *of the Development Land to that effect;*

7. *shall establish that the Project Company shall not alienate, transfer or encumber the Sub-Lease, the Project or any part thereof, except for establishing a mortgage in furtherance of 1(i)(6) above (unless otherwise consented to by SMH Cruise);*

8. *shall establish that the Project Company shall be allowed to rent out the units in the Project in written transactions at arm's length and only to parties unaffiliated with Zebec, the Project Company or their Affiliates (unless otherwise consented to by SMH Cruise);*

9. *shall establish that at least 6 of the 16 stores in the Project shall upon opening of the Project be rented out to sell products of high-end mono brands as approved by SMH Cruise, which approval shall not be unreasonably withheld, and that the Project shall during the Lease Term (and Option Term, if applicable) be operated at a high standard both in terms of overall appearance and in terms of goods sold and services provided, as such standards shall be further determined reasonably in the Sub-Lease;*

10. *shall establish that if* [sic] *SMH Cruise is confronted in court with the exclusivity claims (currently made by third parties out of court) that relate to the area of the Project and these claims are awarded by a court of law with jurisdiction in the matter concerned, the Project Company shall make best efforts to cooperate in the mitigation of the resulting damages for SMH Cruise or such third parties, at the direction, the cost and expense of SMH Cruise with the understanding that the best efforts does not mean, and SMH Cruise cannot in connection therewith impose, request or force i) closure of any stores in the Project, ii) restrictions on merchandise that is sold in the stores or that will be sold in any future stores in the Project.For the avoidance of doubt, if the best efforts result in damages, expenses or other financial losses to the Project Company, these shall be carried by SMH Cruise;*

11. *shall establish that SMH Cruise may on reasonable notice inspect and audit all documents, including leases, for the Project in the possession of the Project Company; and*

12. *shall establish that the Project (and everything built otherwise on the Development Land) shall (i), in the absence of the Option Term coming into effect, at the end of the*



*Lease Term and thus the end of the Sub-Lease, be turned over to SMH Cruise in 'as is' condition, free and clear of any mortgages, pledges, leases or other (security) rights of third parties, against compensation by SMH Cruise of the present value thereof, taking all economically relevant conditions into account, which present value shall be determined by binding advice of an expert (appointed by the Project Company and SMH Cruise jointly, or else by the court in SintMaarten) if the Project Company and SMH Cruise shall not otherwise agree, or (ii) on the last day of the Option Term and thus the end of the Sub-Lease, be turned over to SMH Cruise in 'as is' condition, free and clear of any mortgages, pledges, leases or other (security) rights of third parties, without any compensation by SMH Cruise (or the ==fee simple owner== of the Development Land) being due.*

(ii) *In connection with the Sub-Lease, SMH Cruise now represents, covenants and warrants to both Zebec and the Project Company, and throughout the Lease Term and the Option Term, if applicable, that SMH Cruise is duly authorized to enter into the Sub-Lease with the Project Company, upon the terms and conditions hereof.*

(iii) *The Sub-Lease shall contain a representation by SMH Cruise that the Development Land is in full compliance with applicable laws, including environmental laws, and that no hazardous or dangerous substances exist thereon or therein.*

(iv) *The Sub-Lease shall provide for easements in favor of the Project Company and SMH Cruise (or Affiliated Company), for the access of employees and cruise passengers to and from the adjacent properties at the Port (it being understood that, in principle, the Project as part of the Port is not accessible for the general public).*

(v) *The Sub-Lease shall be granted by SMH Cruise to the Project Company in the form of a right to subleasehold (in Dutch: ondererfpacht).The Sub-Lease shall be executed on the date on which the last of the following conditions having been met:*

(a) *Zebec shall have incorporated the Project Company and shall have granted to SMH Cruise the Purchase Option (as defined below);*

(b) *a separate official ==measurement certificate== shall have been drawn up for the Development Land;*

(c) *SMH Cruise and the Project Company shall have requested and obtained the building permit (and such other permits as may be required) from the Island Territory of Sint Maarten for the Project (the "Building Permit"), whereby both SMH Cruise and the Project Company shall provide commercially reasonable assistance in obtaining the Building Permit, but the costs shall be for the Project Company;*

(d) *EFB shall simultaneously transfer to SMH Cruise or an Affiliate Company of SMH Cruise the EFB Harbor Property; and*

(e) *the Development Agreement shall have been agreed and entered into between SMH Cruise and the Project Company.*



*Each of the Parties shall make commercially reasonable efforts to meet the above conditions as soon as possible after the Effective Date (as defined below).If the above conditions have not been met within three (3) months of the Effective Date, either Party may terminate this MoU by written notice to the other Parties (provided theParty issuing such notice has not defaulted in its compliance with this MoU).*

*(vi) Each Party shall bear its own expenses associated with this MoU and the transactions contemplated herein.The Project Company shall however carry the notarial costs, the taxes and other expenses of the Sub-Lease.*"

39.   The foregoing quotation - clause 1 of the MOU - is the essence of the agreement between the parties. The key points are:

- Clause 1(i)(1): the Port receives an "Initial Fee" of USD 1.5 million.
- Clause 1(i)(3): The Sub-Lease has a term of 25 years and can be extended by the same term (total 50 years);
- Clause 1(i)(4): The ground rent owed for the sub-lease ("Sub-Lease Rent") will be gradually increased and is based on the net rental income of the Project, with an annual minimum of USD 300,000;
- Clause 1(i)(9): There will be sixteen (16) shops, at least six (6) of which will sell so-called "mono brands".[1]

The conditions from clause 1 of the MOU are referred to as the "Required Approvals" (see: clause 8 of the MOU) and, as is indicated, require the approval of, among others, the country of Sint Maarten.

40.   In accordance with clause 8(b), the Port was to have secured the required approval within three months after signing - no later than on December 10, 2010 therefore. This approval would have to be requested based on the plans drawn up by KERN Architecten.

41.   On November 30, 2010 it became clear that the Harbor Arcade Group (the Indian Merchants headed by Danny Ramchandani) and the people behind Pineapple Pete were throwing a monkey wrench in the works. Both groups have or had commercial interests in the cruise terminal and it emerged that the Port had also made agreements with these groups. Since Zebec believed in the Project and very much wanted it to go ahead, negotiations were held with these groups and the ruffled feathers were eventually smoothed.

42.   In the meantime, EFB Properties N.V. transferred the three plots mentioned above to the Port, in accordance with the MOU. The Port did not make any payment in money. In first instance

---

[1]   "Mono brand" refers to shop like an Apple Store, for instance, which only sells Apple products.



the intention was that the value of the plots would be set at one half million US dollars and that this amount would be deducted from the Initial Fee as described in the MOU.

43. At a later point (long after the plots were already transferred) it was decided that the Initial Fee would be reduced to USD 1 million and Zebec received a payment of USD 500,000 from the Port.

*First addendum*

44. Because the Port indicated that it would not make the deadline for securing the "Required Approvals", a first addendum to the MOU was signed on December 3, 2010 (**exhibit 7; EXHIBIT BINDER #2, D2**).

45. The provisions in the MOU concerning the plots from EFB were declared not applicable (after all, these had already been transferred), the time period for the Required Approvals was extended and Zebec made an advance payment ("Advance") to the Port of USD 750,000.

46. It is important to devote attention here to the fact that all the other provisions and recitals of the MOU remained in force unchanged. The agreement still concerned a Project with a surface area of 14,000 square meters in the cruise terminal, comprising sixteen (16) shops, six (6) of which were to sell exclusively mono brands.

47. After signing this addendum, the intention was that the Port would secure the Required Approvals by May 10, 2011 at the latest.

48. After a few meetings at the start of 2011, the cooperation again faltered around mid-February 2011. The Port had seriously underestimated the interference from the Harbor Arcade Group and asked Zebec to make even more compromises. Zebec was asked to not lease out any retail space where "mixed electronics" or "mixed jewelry" would be sold. Apparently the Indian Merchants had demanded this of the Port at some point. It also emerged that the Port itself wanted to operate a "liquor and tobacco store" in the Project and that there could be no other stores selling alcohol in the Project. These matters had not been discussed earlier with Zebec and were not included in the MOU or the first Addendum therefore. Such restrictions on the possibilities for leasing out the space would make successful operation more difficult.

49. As a sign of good faith, Zebec nonetheless compromised to some extent. Zebec did send the Port a letter in February 2011 expressing its disappointment with the course of affairs and stating that by now there was no more leeway possible in the relationship:

"*I was asked to inform you that my clients find it against the spirit of the MOU to keep adding requirements in order to satisfy the Harbor Arcade Group. My clients thought that Harbor Arcade has no involvement in this new project as was reflected in the MOU and they are*



*puzzled why this issue keeps coming back to the table.Nevertheless, to show good faith my clients are prepared to once again make a compromise in the spirit of being good partners.*" This letter is submitted here as **exhibit 8 (EXHIBIT BINDER #2, B9)**.

50. In the letter, a number of concessions were made to keep the Harbor Arcade Group ("Indian Merchants") and Carnival Cruise Lines, a big player at the cruise terminal on Sint Maarten, happy. The designs from KERN Architecten had to be amended once again.

*Second addendum*

51. It became clear on March 21, 2011 that the Port wanted more changes once again. The Port proposed that a second addendum to the MOU be signed. The Port must and will operate the sole "liquor and tobacco" store in the Project: "[O]*ne issue that continued to come up was that four persons on the side of the Port* [...] *are convinced that in the last personal conversation that they had with the representatives of Zebec it was agreed that there would be only one store in the Project that would sell liquor and tobacco, which would be rented by the Port.*" This letter is submitted here as **exhibit 9 (EXHIBIT BINDER #2, B10)**.

52. On May 11, 2011 the Port sent Zebec an email with the final version of the second addendum (**exhibit 10;EXHIBIT BINDER #2, B11**). The email specifically mentioned the Cruise Lines and stated that a "passenger flow" drawing requested earlier by the Cruise Lines had been approved. It is also mentioned that the surface area concerned amounts to "*3800m2 net leasable building space, 500m2 restaurant and 3300m2 for the 16 stores combined*".

53. The second addendum to the MOU was then actually signed on May 13, 2011 (**exhibit 11; EXHIBIT BINDER #2, D3**). In this second addendum, which, according to the wording of the document, remained in force alongside the first addendum, clause 1 of the original MOU cited above was expanded substantially.

54. The important additions relate to the influence of the cruise companies Royal Caribbean Cruise Ltd ("RCCL") and Carnival Corporation & Plc ("Carnival"). As important players in the cruise terminal on Sint Maarten, they apparently had several agreements with the Port - the exact content of which is still not known to Zebec - which gave them some influence in the development of Zebec's Project (See: second addendum, section A, sub (1), (2), (6), (7), (8) and (9)).

55. In addition the Port was granted the right of priority - which it evidently needed in order to be able to satisfy the Harbor Arcade Group/Indian Merchants - to nominate lessees for the mixed electronics and/or mixed jewelry stores (see: second addendum, section A, sub (4)). The Port was also given the guarantee that during the first ten (10) years of the project, it would be able



to operate the only "liquor and tobacco" store (see: second addendum, section A, sub (5)). It is clear that this was at the expense of Zebec's possibilities of operating the Project.

56.   It was very important for Zebec that the exact size of the commercial part of the Project be further defined. Section A, sub (3) of the second addendum states that a clause 1(i)(14) was being added to the original MOU:

"*shall determine that the Project Company* [read: Zebec] *shall make best endeavors, as far as commercially reasonable, so that at all times the 16 stores of the Project (as described 3300m2 net leasable building space and 500m2 Bar/Restaurant which totals 3800m2 leasable Area) shall, in compliance with Section 1(i)(9) hereof, (i) sell only mono brands not currently sold in the Philipsburg area, and (ii) sell different types of goods, unless otherwise agreed with SMH Cruise, it being understood that if the Project Company shows that it has, each time a vacancy occurs, in good faith made these best endeavors but has been unable to attract a tenant for a store that complies herewith, it shall be relieved from this obligation in that instance.*"[2]

57.   According to the opening lines of the MOU, the total surface area of the Project was 14,000 m2 and sixteen (16) stores would be realized. This second addendum established that the total surface area for retail use would be 3,300 m2 and that in addition to this, 500 m2 of surface area for hospitality use would be realized. Furthermore this refers to "net leasable" surface area. This means that the 3,300 m2 of retail space would comprise the building footprint or actual sales floor. This does not include any warehouse or office space or a second floor therefore.

58.   This time the deadline for the "Required Approvals" to be obtained by the Port was postponed to July 1, 2011. However, the Port failed to meet this deadline as well.

*The Sub-Lease*

59.   Despite the fact that the third deadline had expired on July 1, 2011, Zebec continued to believe that a good conclusion would be reached. If the parties were simply to adhere to the agreement(s), the Project would be a great success. Despite the fact that the Required Approvals were still not forthcoming, the parties started on the next set of documents: the Sub-Lease, which was supposed to give shape to the right of subleasehold for the Project, and the Development Agreement, in which, among other things, the agreements on the construction and operation of the Dutch Village Project were to be elaborated.

60.   On July 25, 2011, approximately one month after the deadline as amended by the second addendum, therefore, Zebec was finally notified by the Port that the measurement certificate for the land for the Project (see: clause 1(v)(b) of the MOU) was almost ready. It emerged that

---

[2]   Underlining added.



a meeting with the RCCL was scheduled for August 7 to 11, 2011 (**exhibit 12; EXHIBIT BINDER #2, B12**).

61.   On July 26, 2011 Zebec finally received the drafts for the Sub-Lease and the Development Agreement (**exhibit 13; EXHIBIT BINDER #2, B13**). The contents of the second addendum had not yet been incorporated in the documents at that point.

62.   On August 5, 2011 Zebec sent the amended documents back to the Port (**exhibit 14;EXHIBIT BINDER #2, B14).** A number of points in the drafts were not consistent with the MOU and the addenda. For instance, it turned out that the total area of the piece of land had suddenly become 1,000 square meters smaller. Once again an amended drawing was made at Zebec's expense. In order to ensure that the buildings would remain within the footprint of the Sub-Lease, the exact location of the buildings was moved slightly.

63.   A second issue was the start date of the (sublease)ground rent. Zebec amended the documents so that this ground rent would not be owed until the Project had actually been built. After all, this is the only way in which Zebec would be somewhat protected from the - at that point - potential arbitrariness of the Port and the significant difficulty the Port appeared to be having in obtaining the agreed "Required Approvals". In Zebec's words:
"*I have again put a date back when ground rent is starting.The whole idea is that Zebec pays a hefty one-time rent fee of 1.5 million for 14000 square meters of land (which now turns out to be 13000 square meters) and that additional yearly rent is then calculated based on rental income and minimum passenger flow.During construction there shouldn't be charged any ground rent as there is no rental income and passenger flow is irrelevant.It also pushes the harbor to work extra hard on the approval process.No approvals is no construction, is no income for nobody.It is the only mechanism in place that protects Zebec somewhat to prevent they are being charged rent without being able to use the land because approvals take ages for whatever reason as is the case right now.*" (see: exhibit 14; EXHIBIT BINDER #2, B14)

64.   In light of the current proceedings, this email can almost be called prophetic. Or perhaps Zebec even put ideas in the Port's head with this email. If the Port and Mark Mingo had set about their work energetically and honestly, these proceedings would never have been instituted.

65.   In an attempt to speed up the entire process, Zebec also proposed in this email (exhibit 14; EXHIBIT BINDER #2, B14) that it maintain direct contact with the Cruise Lines instead of the communication having to take place via the Port, each time with serious delays. After all, shorter lines of communication would ensure faster and clearer results. The Port was not interested in this however.



66.   On August 26, 2011, approximately two months after the deadline as amended by the second addendum therefore, the Port sent another amended version of the Sub-Lease and the Development Agreement (**exhibit 15; EXHIBIT BINDER #2, B15**). With the exception of the moment at which the annual minimum in rent / ground rent starts being owed, the parties were in agreement with each other.

67.   On September 1, 2011 – the Required Approvals had still not been obtained by the Port - (former) civil-law notary Parisius was asked to prepare the Deed of Sub-Lease for signing (**exhibit 16; EXHIBIT BINDER #2, B16**). On or around September 8, 2011, just before the deed was to be signed by the parties, a different civil-law notary was chosen, at the Port's insistence: civil-law notary Mingo, the sister of the Port's CEO Mark Mingo. On September 9 the Deed of Sub-Lease was executed by the parties. It is conspicuous that the surface area of the plot emerged to be only 12,967 m2, in contrast to the 14,000 m2 originally agreed (**exhibit 17; EXHIBIT BINDER #2, D6**).

68.   It should be pointed out that this Deed of Sub-Lease is **not** the final Sub-Lease as submitted as exhibit 1 above. The Sub-Lease in exhibit 1, the final right of subleasehold, is dated March 5, 2012. The deed executed before Mingo in September 2011 emerged to be void - more on this later.

69.   On October 26, 2011 the Port sent Zebec a letter from Mr. John F. Tercek, VP of RCCL, dated September 15, 2011. Why it took nearly a month and a half for this letter to be forwarded to Zebec is still not clear. In this letter, submitted here as **exhibit 18 (EXHIBIT BINDER #2, B18)**, RCCL explicitly refused to give permission for the Harbour Village Project, since it turned out that RCCL had an earlier agreement with the Port which limits the operation of the particular plot to a retail area of maximum 10,000 square feet or 1,000 square meters. RCCL wrote:
"*That certain Memorandum of Understanding dated September 20, 2010 between Sint Maarten Harbour Cruise Facilities N.V. and Zebec Development N.V., as amended by that First Addendum dated December 3, 2010, and that Second Addendum dated May 13, 2011, describes the Dutch Village project as having 16 stores and a restaurant encompassing '3300m2 net leasable building space and 500m2 Bar/Restaurant which total 3800m2 leasable area'.At 40,902 square feet, this proposed development is far in excess of the agreed upon size limitation in the Development Agreement* [with RCCL].*As such, Developer* [read: RCCL] *is unable to approve this development on the Other Parcel.We look forward to reviewing a revised proposal and discussing this matter with you in more detail.*"

70.   It is clear from this letter from RCCL that the Port had entered into an agreement with Zebec that from the start it would be unable to comply with. The agreement between RCCL and the Port (according to RCCL in its letter) was contracted on March 29, 2009 and (evidently)



contained in clause 19.18 a stipulation that RCCL's permission was required for any further development of the land that Zebec had received in sublease from the Port.

71.   **Brief summary:** More than a year after the original MOU was signed, the Port had still not arranged for the Required Approval. Even worse, RCCL refused to give its Required Approval because it suddenly emerged that RCCL had an earlier agreement with the Port. It also emerged that this agreement drastically limits the potential surface area of the retail use of the plot in question. The Port would only be able to comply with its obligations to Zebec by failing to comply with its agreement with RCCL therefore.

*ITEC Entertainment Corporation*[3]

72.   In the meantime, however, the Port had decided in consultation with the shareholder representative at the time, Theo Heyliger, that the plans for the Harbour Village Project were not lavish enough. Mr. Heyliger wanted more entertainment options added, so that the whole development would be more like a theme park. In November 2011 Zebec's representatives traveled with Theo Heyliger to Orlando, Florida, to expand the plans for the Harbour Village Project.

73.   Zebec was told that this would also make the project more appealing for the cruise lines, which would make it easier to obtain the Required Approvals. Despite the fact that by this point Zebec had already invested thousands of dollars in drawings and project plans from KERN Architecten, it was decided that the people from ITEC Entertainment Corporation (ITEC) would be engaged.

74.   Using the plans from KERN as the starting point, ITEC, which also works for Disney in Orlando, expanded the plans substantially. A large windmill was added and a 'lazy river' waterway which would let cruise passengers float through the project (via a typical Dutch canal) at a leisurely pace.

*Development Agreement*

75.   Despite the fact that the Port had made all sorts of promises and signed agreements that it was no longer prepared to comply with, Zebec was not disheartened. Instead of throwing in the towel, it worked hard to come up with a solution for the problems with the Cruise Lines.

76.   At a meeting held by the parties on January 13, 2012 - also attended by the Minister of VROMI on behalf of the country of Sint Maarten - an initial solution was found in the phased realization of the Dutch Village Project. The construction of the retail area, 3,300 m2 net in accordance with the MOU and its addenda, would be split into two phases. Phase 1 would involve the first

---

3    http://www.itec.com/harbour-village



1,000 m2 – in accordance with the agreement that evidently existed between the Port and RCCL – and after this Phase II would encompass the remainder of 2,300 m2 net. As also pointed out by John Tercek of RCCL, the restaurant area of 500m2 was not included in this.

77.   Briefly it seemed as if everything was going smoothly. The Port announced the news with great fanfare and the responsible minister informed the parliament about the plans. In January 2012 The Daily Herald and TodaySXM devoted some attention to the project. The Daily Herald of January 20, 2012 reported the following:

"*Heyliger said the Harbor and Zebec had 'entered into discussion to come up with a proposal to create a new facility that includes not only a Windmill, etc., but also stores and other attractions.'He added that the Harbor would share in the revenue of the project, but had not made any financial investment.The minister did not divulge any specifics of this deal and he was not asked for clarification by the MPs.*"[4] (**exhibit 19; EXHIBIT BINDER #2, A3**).

78.   Unfortunately once again it emerged that the Port could not match Zebec's good faith. Just as prior to the second addendum, once again it emerged that the Port could not adequately respect the agreements. On February 6, 2012 Zebec once again sent the Port a letter expressing its displeasure (**exhibit 20; EXHIBIT BINDER #2, B21).** The Development Agreement was still not finalized and the Port was continuing to stall the case:

"*After reading your comments below I have to say that I'm very disappointed about the lack of progress you've made in moving this process forward.Even something as relatively simple as finalizing the Development Agreement has yet to be achieved.*

*In our meeting of January 13th all parties agreed to a limited scope for the Phase I development consisting of approx. 1,000m2.An area for retail development was clearly outlined in the conceptual plan as suggested by the good Minister.Now from your comments below it seems we're back to the drawing board looking for additional plans to present to RCCL.We've spent hundreds of thousands of dollars creating, recreating and adjusting plans for the past couple of years including traffic flow patterns for incoming and outgoing passengers and the introduction of increased entertainment facilities.And yet, we find ourselves no closer to obtaining the necessary approvals we need to satisfy our own plans and those of our lender.*"

79.   At the end of February 2012 the Port finally sent Zebec an updated version of the Development Agreement. Unfortunately it turned out that this version was not entirely in order either. On February 22, 2012 Zebec sent the Port six points that needed to be amended (**exhibit 21; EXHIBIT BINDER #2, B22).**

---

4   The title of the article was very telling: "*Harbour to get revenues from Dutch Village, did not invest*".



80.   On February 24, 2012 the Port sent Zebec the new versions of both the Development Agreement and the new Sub-Lease (**exhibit 22; EXHIBIT BINDER #2, B25)**. Based on these documents, the parties reached agreement and made an appointment to sign the documents on Monday, February 27, 2012.

81.   The Port failed to show up on the particular Monday, however. When the representatives from Zebec arrived at the Port office, the Port's representatives turned out not to be on hand. CEO Mark Mingo's secretary knew of nothing and Zebec had to return home with nothing accomplished. There had not even been a warning email (**exhibit 23;EXHIBIT BINDER #2, B26).**

82.   On Tuesday, February 28, 2012 - 18 months after the original MOU and despite the fact that the Port had still not obtained any Required Approvals - the Development Agreement was signed by the parties. The Development Agreement is submitted here as **exhibit 24 (EXHIBIT BINDER #2, D4)**.

*New Sub-Lease*

83.   As already mentioned above, the Sub-Lease as signed in September 2011 (see: exhibit 17) is not the final Sub-Lease submitted as exhibit 1 (EXHIBIT BINDER #2, D5). The latter document dates from March 5, 2012.

84.   In February 2012 it emerged that the Sub-Lease as signed in September 2011 was void. Specifically, this was not executed at the time by civil-law notary Parisius as Zebec had proposed but, without any form of consultation, had suddenly to be executed at the office of civil-law notary Gijsbertha, where the sister of Mark Mingo, director of the Port, was a junior civil-law notary. Ms. Mingo was taking care of the duties and executed this deed. Zebec learned subsequently that this was not permitted and that the deed was void because the brother of the executing civil-law notary was party to the deed, which is prohibited in the national ordinance on the notarial profession. Seen in retrospect Zebec cannot rule out that this may have been deliberately orchestrated this way.

85.   In the end a new, valid version was signed and executed on March 5, 2012, at Zebec's insistence. Despite the fact that Zebec should perhaps have known better at this point, the Port was paid another sum of USD 1 million to bring the total in Initial Fee to USD 1 million (USD 1 million in cash and USD 500,000 in land from EFB Properties (see above)).

*The about-turn*

86.   In May 2012 the Port announced that the drawings had to be amended somewhat in order to leave enough space for the emergency services vehicles (**exhibit 25; EXHIBIT BINDER #2,**



**B27**). No sooner said than done. At the same time there was talk about a final meeting with all the interested parties, including the Cruise Lines, in order to present the definitive plans.

87. The meeting finally took place on August 10, 2012. Minister Romeo Pantophlet and Mr. Frans Richardson were in attendance on behalf of the country of Sint Maarten. The Cruise Lines were not represented unfortunately. In a follow-up letter dated August 13, 2012, Zebec expressed its confidence about the future of the Project and it was once again confirmed that Phase I would only involve 1,000 m2 of retail area - in accordance with the agreement between the Port and RCCL - but that the ultimate goal of the cooperation was the full 3,800 m2 as originally agreed (**exhibit 26; EXHIBIT BINDER #2, B28**).

88. It was also once again confirmed in the letter of August 13 that the building permit had been obtained on the basis of the approved building plans:
"*As you know we received the required building permit and we're anxious to move the construction forward.Although certain design elements, cosmetics and infrastructure changes have been introduced in the revised plans, the footprint of the approved structures remains unchanged and in line with the original building permit approval.*"
Zebec subsequently requested access to the location in order to gather the building materials. Zebec explicitly said it would take into account the Port's interests in this:
"*We have to date stored these materials in an offsite location; however, this is no longer available to us and in any event we need to start mobilizing the site.These construction materials need to be consolidated at the Dutch Village location.We require unrestricted access to the site to accommodate this movement of materials.With that in mind we require your assistance to put us in touch with the appropriate site manager so we can begin this process by next week.Please let us know who to contact in order that we can develop a plan that is the least disruptive to the Harbor's ongoing operation.*"

89. A response to the letter was not received until two weeks later. In a formal letter dated August 30, 2012 - whose content, it emerged later, was worked into the ground repeatedly - the Port said it refused to lend any further cooperation (**exhibit 27; EXHIBIT BINDER #2, B29**). It will undoubtedly have struck Your Court that the tone of the correspondence - along with the usage and grammar - had suddenly changed drastically. Since the content of this letter is characteristic of the relationship between the parties from this moment onward, Zebec feels compelled to cite it in its entirety here:
"*On February 28, 2012, SMH Cruise, Zebec Development N.V. as the Developer and Valuta Holding Ltd. entered into the development agreement for the Dutch Village (Development Agreement), and subsequently the notarial deed of sub-lease of March 5, 2012 was entered into between SMH Cruise and the Developer (Deed).All capitalized terms used herein have the meaning ascribed to them in the Development Agreement, unless stated otherwise.*



*Pursuant to Article 2.1 of the Development Agreement, the Developer shall develop the Project in accordance with the design scope, density and the construction schedule set forth in the Development Plan, which shall be submitted by the Developer within two (2) months from the effective date, and requires approval of SMH Cruise.To date we have not received the Development Plan from you, despite* [sic] *several requests.*

*Pursuant to Article 2.2 of the Development Agreement within three (3) months from the effective date, Developer shall submit the Construction Documents and Drawings for the Project for the written approval of SMH Cruise.To date we have not received the Construction Documents and Drawings from you.These can also not be drawn up properly, as there is no approved Development Plan yet.*

*As soon as the Development Plan has been submitted to us, we will be in a position to request the cruise lines to approve the Project, which approval is thus still to be obtained (although one of the cruise lines, Carnival Corporation, did not raise any preliminary objections to the initial project, the retail section thereof has now been significantly reduced and we are obliged to again request Carnival Corporation's approval thereof).Only thereafter we will be in a position to evaluate the Construction Documents and Drawings, as they may be received from you, and approve them (provided the cruise lines have approved the Project).Once you have provided us with proof of having obtained all necessary permits and other governmental approvals, we will provide you with approval to commence.The date of such approval to commence is the Date of Commencement.*

*Pursuant to Article 10 of the Deed, until the Date of Commencement, it shall be prohibited to i.a. commence construction of the Project (or otherwise dig, build or construct anything) on, at or in the Sub-Lease Parcel.Therefore, no preparatory, mobilization or other actions can be taken by the Developer with respect to the "site" and we cannot dedicate resources at this time to make access thereto available, as this would violate the aforementioned Article 10.*"

90. Despite the explicit reference to this Article 10, the Port did ask Zebec to install the current fencing. On the photographs submitted earlier, this is the yellow fencing surrounding the entire plot. This yellow fence can be easily seen from the beach of Great Bay. The Port did not allow the placement of an announcement sign as is usual for such projects.

91. The formal letter from the Port dated August 30, 2012 is full of untruths and gives an unfortunate twist to the cooperation up to that point. In the two years since the original MOU, it has constantly been the Port that has been unable to comply with its obligations. Out of leniency and in the spirit of a fruitful cooperation, Zebec has always been willing to compromise. The fact that the Port is suddenly trying to reverse the roles at this point is not right.

92. In contrast to what the Port alleges, the Development Plan (pursuant to clause 2.1 of the Development Agreement) had not been requested earlier. Nor would that be logical, since this



Development Plan had already been submitted earlier. Once Zebec receives the approval for this, it can draw up and submit the Construction Documents and Drawings in accordance with clause 2.2.

93.   It is, for the rest, impossible for a developer to figure out exactly where the connection points for e.g. the electricity grid and sewage system are without access to the location. Nonetheless a very important part of a project.

94.   On September 4, 2012 Zebec sent its official response, in which it once again voiced its disappointment. In this letter, submitted here as **exhibit 28 (EXHIBIT BINDER #2, B30)**, it is once again explained that the Development Plan consists of the drawings that were amended earlier at the insistence of the Port and the Cruise Lines (see, among others, the letter from RCCL; exhibit 18; EXHIBIT BINDER #2, B18). It was among other things on the basis of these drawings that the Development Agreement was agreed on. Zebec also explained that as far as the Construction Documents and Drawings are concerned, these cannot be drawn up until the Cruise Lines have given a green light for the Project. The Port has had these drawings since February 2012 and it is the Port - also according to the original MOU - that has the job of securing the approval of the Cruise Lines (the "Required Approvals"):

"*We also wish to remind you that our contractual obligation to provide a Development Plan, Construction Documents and Drawing and ultimately develop the Project is with SMH Cruise.We have provided you with sufficient Project drawings to establish traffic flow patterns, density and general layouts of the buildings and yet we continue to wait for approval of the Project from the cruise lines, which approval is ultimately your responsibility.We consider you to be in serious breach of your obligations under our respective agreements.*"

95.   In first instance it seemed as if (the content of) this letter has gotten through to the Port. On September 25, 2012 the Port finally sent the revised drawings to the Cruise Lines with the request that these be approved (**exhibit 29; EXHIBIT BINDER #2, B31**). It should be pointed out that this letter was not sent to RCCL until more than a year after the earlier refusal. At this moment, the Port had had the amended drawings - for which the Minister had already expressed his approval and Zebec had already received the building permit (**exhibit 30; EXHIBIT BINDER #1, TAB 10**) - in its possession for over six months.

96.   In October 2012 it seemed as if progress was finally being made. The parties met in Miami, Florida for a new presentation of the Project to the Cruise Lines. In addition to Zebec, the Port and the Cruise Lines, also present were Minister of Tourism at the time Romeo Pantophlet, MP Frans Richardson and commissioners Humprey Mezas and Renald Williams. Zebec had taken its design team along to be able to directly implement any suggestions and/or wishes in



the designs. As its pièce-de-résistance, Zebec showed a film made especially for the occasion by ITEC, in which the entire Project was shown in 3D.[5]

97.  Shortly after the return to Sint Maarten, Zebec sent the Cruise Lines the plans for the Project, as amended in response to their request (**exhibit 31; EXHIBIT BINDER #2, C2**). Thanks to Zebec's efforts and flexibility, it seemed as if the necessary approval would finally now be obtained.

98.  On October 23, 2012 Mr. David Candib, on behalf of the Carnival Corporation, one of the two Cruise Lines, sent a notice to the Port (**exhibit 32; EXHIBIT BINDER #2, C3**). Carnival asked for a few last minor adjustments before it would give its official approval.

99.  On December 13, 2012 the Port sent RCCL a reminder (**exhibit 33;EXHIBIT BINDER #2, C4**) asking that approval be granted as soon as possible. The Port stated that it would be organizing the annual FCCA Conference in 2014[6] and that it would like to see the Project realized by that point.

100.  On December 14, 2012 Zebec sent the Port the confirmation that the changes requested by Carnival Corporation would not be a problem (**exhibit 34; EXHIBIT BINDER #2, C5**): "*The modifications to the design plan which Carnival has requested are minor and we have no difficulty accommodating these changes. […] Given that we are readily prepared to accommodate the two issues within our control, we consider that Carnival has in essence approved our project.*"

101.  It is important to reflect here on the fact that, in view of the provisions of the Development Agreement, this approval must be obtained on the part of the Cruise Lines had to be obtained by the Port based on the Development Plan among other things. In conformity with Article 2.2 of the Development Agreement "*SMH Cruise shall first have obtained approval for the Project from Carnival Corporation and Royal Caribbean Cruise Lines, or the relevant affiliates thereof (the 'Cruise Lines'), regardless of the form in which the Construction Documents and Drawings are submitted by the Developer*".

102.  At the end of 2012, more than two years after the parties signed the original MOU, everything appears to be finally concluded. With the last minor amendments requested by the Cruise Lines it appears that they are in agreement with the Project. The Port also seems especially

---

[5]  This can be seen at https://www.youtube.com/watch?v=JPhDQRMSBw0; Google search term: "harbour village sxm".

[6]  The Florida-Caribbean Cruise Association (FCCA) is the business organization for the various cruise ship companies that operate in the Caribbean. The 21st Conference is to be held in Sint Maarten in October 2014. See:https://www.regonline.com/builder/site/Default.aspx?EventID=1536034



enthusiastic. In a nice glossy brochure (**Exhibit 35; EXHIBIT BINDER # 2, A4**) the Port publicly devoted much attention to the Harbour Village project. In the words of Mark Mingo: "*Plans are also under way for a Dutch Village in the port. Visitors have been missing our Dutch connection, so we decided to create a Dutch Village around a traditional windmill to get people interested in our history and cultural background.*"

103.   The location of the Harbour Village project is very visible on the first two pages. On page 10, attention is given to the Project as a new tourist attraction. On page 27, the Project is mentioned in the context of real estate developments in the cruise terminal. It should be noted that the Project is once again included with a surface area of 14,000 m2.

*Formal approval*

104.   In early 2013, the Harbour Village Project appeared to be slowly but steadily moving in the right direction. On January 7, 2013 Zebec sent an e-mail to the Port asking whether official approval had finally been received. Almost immediately afterwards, Zebec received a somewhat cryptic e-mail from Mark Mingo informing that the Minister (at the time Theo Heyliger) would have a private meeting with John Tercek of RCCL at the end of January 2013 and that the Port had yet to respond to the response it had apparently received from RCCL (**Exhibit 36; EXHIBIT BINDER # 2, C6**). Zebec is again kept in the dark.

105.   On January 18, 2013 the Port again sent a formal letter to Zebec (**Exhibit 37; EXHIBIT BINDER # 2, C8**). This time, however, the tenor of the letter was more positive. The Port indicated that it has not yet managed to arrange approval for Phase II of the Project (the expansion from 1000m2 to 3300m2 retail area); the Port indicated that it wanted the Harbour Village project completed before the start of the 2014 FCCA Conference; and the Port requested the final version of the Construction Documents and Drawings referred to in Article 2.2 of the Development Agreement. Zebec was also asked to provide a "construction timeline" for when the Construction Documents and Drawings are approved by the Port.

106.   The following points can be deduced from this letter:
- The Port wants to commence the actual construction as soon as possible so that everything is ready for the FCCA Conference in 2014;
- The requirements of Article 2.1 of the Development Agreement have been fulfilled so that the parties can finally continue with Article 2.2 of the Development Agreement;
- The Cruise Lines have not (as yet) agreed to Phase II (as defined in Article 2.11 of the Development Agreement) but have agreed to Phase I; and
- The Port will give its written approval to the Construction Documents and Drawings when they are presented. Since the Cruise Lines have now agreed, in conformity with Article



2.2 of the Development Agreement it would be unreasonable if the Port refuses this formality.

107. On March 7, 2013 Zebec received a new message from the Port (**Exhibit 38; EXHIBIT BINDER # 2, C11**). The Port acknowledged receipt of some drawings specifically modified for the Cruise Lines and in this letter it gives its official written approval to begin construction in accordance with Article 2.1 of the Development Agreement: "*Therefore, SMH Cruise is prepared to proceed with the Project and render all assistance required, as per the Development Agreement, for the realization thereof. Please consider this letter the formal confirmation that you may continue with the preparatory works for the projects, in accordance with the Development Agreement.*"

108. Zebec was pleased and sent an e-mail in confirmation on Monday, March 11, 2013 (**Exhibit 39; EXHIBIT BINDER # 2, C12**). In this e-mail, Zebec indicated that the Construction Documents and Drawings would be ready within a short period of time. In the meantime, in order to start construction as soon as possible, it again requested to be put into contact with the site manager. On Monday, March 25, 2013 Zebec also finally received approval to take actual (physical) possession of the parcel of land in order to carry out all preparatory work (**Exhibit 40; EXHIBIT BINDER #2, C13**).

109. Unfortunately, despite this approval, Zebec was denied actual access to the location. Zebec also did not acquire contact with the site manager and Zebec did not receive any information regarding the (previously mentioned) possible connections, including connections to the power grid. All requests by Zebec to the Port were politely declined.

110. On May 23, 2013 Zebec received a formal letter from the Port again (**Exhibit 41; EXHIBIT BINDER # 2, C14**). Apparently, there was a wish on the part of the Port to further explain the previous formal written approval in accordance with the Development Agreement. The most important part of this letter is the completely new interpretation of the potential retail area: "*For clarification purposes, we confirm that the Project, as to be further outlined in the Construction Documents and Drawings for the Project to be submitted for our written approval, is allowed to contain a footprint of up to 10,000 square feet of retail space; whereby the footprint is defined as the outline of the total area of the Development Land that is surrounded by the exterior walls of the buildings thereon, exclusive of courtyards. Provided, however, that, since the Project may at this stage not contain more than 10,000 square feet of retail space, and the buildings may consist of more than one floor, this will entail that only one floor of the buildings can be used as retail space.*"

111. Zebec was extremely surprised at this new restriction imposed by the Port and was logically unhappy about this. The plans have assumed multi-storey buildings from the first moment -



which can also be seen in all presentations - because the other shops in the cruise terminal also have multiple floors. We have already explained earlier that the surface area figures refer solely to the footprint of the buildings.

112. On June 10, 2013 Zebec sent the Port an e-mail in which it expressed its dissatisfaction and surprise (**Exhibit 42; EXHIBIT BINDER # 2, C15**). Because a response was not forthcoming on the part of the Port, Zebec sent it a reminder on June 12, 2013 (**Exhibit 43; EXHIBIT BINDER # 2, C16**). Given the large investments involved in the Project - which must be recouped especially from rental income from retail space - and the pressure on Zebec to provide the Construction Documents and Drawings, it was important that this was clarified as soon as possible. Unfortunately, again no response was received.

113. On June 25, 2013 Zebec sent a second reminder to the Port (**Exhibit 44; EXHIBIT BINDER # 2, C17**). For some reason, the e-mails from Zebec appear to no longer reach the Port and an urgent request was made to provide access to the actual project location. Despite the formal commitments on the part of the Port (**see Exhibits 37, 38 and 40 (EXHIBIT BINDER # 2: C8, C11 and C13)**), Zebec was systematically denied access to its parcel of land.

114. On July 2, 2013 Zebec finally received a substantive response from the Port (**Exhibit 45; EXHIBIT BINDER # 2, C18**). In this letter, the Port confirmed its previous formal permission and the earlier limitation of the retail space was explained further:
"*We confirm that the Project, as to be further outlined in the Construction Documents and Drawings for the Project to be submitted for our written approval, is allowed to contain one or more building(s) with up to two storeys, and that generally we will not impose any undue restrictions on the total footprint of the building(s) of the Project.*
*However, based on the requirements that we have to take into account as part of the approval process for the Project with the Cruise Lines, it is currently a strict limitation that the total space of the buildings(s) of the Project that will be used for retail or shops, is limited to 10,000 square feet.*
*If you would decide to have a tenant use part of the second floor of the building(s) of the Project for warehousing or administrative functions complementary to a shop, then it is our opinion that such part of the second floor shall not count for calculating the total 10,000 square feet of space used for retail or shops, as it is not being used as retail space or shops.*"
This explanation regarding the retail space is somewhat positive. It is striking, however, that it fails to address the fact that the employees of the Port have refused to grant personnel of Zebec access to their plot of land.

115. On October 3, 2013 Zebec sent an update to the Port (**Exhibit 46; EXHIBIT BINDER # 2, C19**). The final details were made to the agreements on the replica of the Dutch windmill and the so-called "lazy river" attraction for tourists. To finalize everything, however, Zebec required



access to the project site: "*We need access to the port next week for a few days with our professional team in order to do the site investigations and coordination.*"

The only response from Mark Mingo is that he is very excited. Then, on October 7, 2013 Zebec delivered the Construction Documents and Drawings referred to in Article 2.2 of the Development Agreement. The acknowledgment of receipt by the Port is submitted here as **Exhibit 47 (EXHIBIT BINDER #2, C20)**.

116.  The delivery of the Construction Documents and Drawings should mean that a start can finally be made on actual construction:

   • In accordance with Article 2.1 of the Development Agreement, the Port provided the required written approval (see EXHIBIT BINDER #2: C8, C11 and C13);

   • The Cruise Lines approved the Project as required by Article 2.2 of the Development Agreement (see EXHIBIT BINDER #2: C8 and C11); and

   • the Construction Documents and Drawings were delivered to the Port (see: Exhibit 47; EXHIBIT BINDER #2, C20). Since the Cruise Lines provided the required approval, in accordance with Article 2.2 of the Development Agreement it would be unreasonable for the Port to refuse to provide its written approval.

The legitimate expectation on the part of Zebec was that, in accordance with Article 2.3 and 2.4 of the Development Agreement, a start could finally be made with the actual construction.

117.  Unfortunately, this was not the case.

   *The beginning of the end*

118.  After the Port received the Construction Documents and Drawings on October 7, 2013 (see Exhibit 47; EXHIBIT BINDER # 2, C20) there was a long silence. The approval of the Port as defined in Article 2.2 of the Development Agreement was not forthcoming and Zebec still had no access to its parcel.

119.  Zebec had full confidence in the Project and had been told by the Port that it was merely waiting for some input from the Cruise Lines. The Port also stated that it was busy drawing up an official press release to give the actual launch of the Project considerable positive media attention. Zebec was not rewarded for waiting in any way.

120.  On May 12, 2014 - more than eight months after the Construction Documents and Drawings were delivered to the Port - Zebec sent a letter to the Port (**Exhibit 48; EXHIBIT BINDER # 2, C21**). This letter set out in detail what is described above and was substantiated by documents, repeated in brief:

   • Since the signing of the original MOU in September 2010, Zebec had paid the Initial Fee to the Port, EFB Properties had transferred real estate to the Port at a very high discount



and Zebec had employed the services of no less than two architectural firms. The costs thus far exceed USD 6 million;

- Although the Port knew it had conflicting obligations with the Cruise Lines, it concluded an agreement with Zebec for the development and operation of 3300m2 of retail space. This led to several compromises on the part of Zebec until currently only 1000m2 can be developed initially. The result is a significant loss in revenue for Zebec;

- Despite the years of delay to the Project due to the Port – construction has currently still not commenced – the Port had found it possible to develop competitive retail space. To make matters worse, the former lessees of Zebec, which it was forced to let go through the actions of the Port, suddenly appear to currently lease retail space here;

- Although the Construction Documents and Drawings were received by the Port by October 7, 2013 at the latest, the Port had still not issued the written approval. As a result, the lenders and potential lessees of the Harbour Village project had serious doubts about the feasibility of the project.

121.  In the final paragraph of this letter of May 12, 2014, Zebec gave the Port a final deadline within which to fulfil its obligations:

"*With that in mind we hereby put you on notice that the following is required by May 16th, 2014; i) a full and final approval of construction documents and drawings as presented, ii) irrevocable written approval to begin construction no later than September 1st, 2014, iii) irrevocable written commitment for the full cooperation of the Port to provide any and all assistance to facilitate the construction process, and iv) the duly executed Third Addendum previously discussed and agreed to and again attached for your reference.*"

122.  On May 27, 2014, after a brief meeting of the parties, Zebec sent a further two full sets of Construction Documents and Drawings (**Exhibit 49; EXHIBIT BINDER # 2, C22**) at the request of the Port. It has subsequently proved that a remarkable advice was rendered based on these sets one day later, on May 28, 2014, by DAM Caribbean N.V. More about this later.

123.  On June 2, 2014, the Port sent a long letter to Zebec (**Exhibit 50; EXHIBIT BINDER # 2, C24**) in which it - in a nutshell – accused Zebec of not having submitted the required drawings and other documents. An earlier formal letter from the Port in which a number of reproaches were made to Zebec is described in detail above (see Exhibit 27). A portion of the text as indicated above, was again repeated. The Port alleged - as in the letter submitted as Exhibit 27 (EXHIBIT BINDER # 2, B29) - in paragraph 6 that no Development Plan was provided by Zebec and in paragraph 7 that no Construction Documents and Drawings had been submitted. This is incorrect, as explained in detail and proved above.



124. In paragraphs 10 and 11 of the letter, the Port manages to completely reverse the roles during the years since the signing of the original MOU. The Dutch Village project that both parties were excited about (see also Exhibit 35), is suddenly referred to as nothing more than a project of Zebec and the Port reproaches Zebec for delaying the Project unnecessarily:

"*Under these circumstances, we believe there is no common ground, common commercial benefit and, of equal importance, common trust present in order to continue with the Project and make it a mutual success. Your continued delay of the Project and attempts to change the agreed terms of the Development Agreement and the Sublease, show us that you do not have a sincere wish to actually continue with the Project (in form and substance as agreed).*"[7]

125. Subsequently, in paragraph 12 of the letter, the Port invoked the possibility of the dissolution of Article 4.1 of the Development Agreement and it demanded that the right of subleasehold on the parcel of land for the Project is returned to the Port. In exchange, Zebec would receive its Initial Fee back in accordance with Article 4.1, plus 6% interest. In anticipation of a possible claim for damages, the Port proposed a concession of USD 300,000.00 extra.

126. As Your Court undoubtedly understands, Zebec was extremely surprised by this letter as all required documents had been received by the Port and the Cruise Lines had also already approved the Project (at least Phase I). Zebec had already received a building permit for the Project and was only waiting for the formal approval of the Port in accordance with Article 2.2 of the Development Agreement, which could actually no longer be refused.

127. In its letter of June 2, 2014 the Port referred to advice of DAM Caribbean N.V. of May 28, 2014. This has been briefly referred to above as this advice is apparently dated a day after Zebec provided the Construction Documents and Drawings to the Port for the second time. In this advice, submitted as Exhibit 50 (EXHIBIT BINDER # 2, C24), DAM Caribbean states that the drawings "*are not issues for a building permit request, a bid or Construction.*"

128. DAM Caribbean then alleges that the surface areas of the various buildings cannot be (easily) deduced from the drawings; DAM Caribbean questions the hurricane resistance of the designs; DAM Caribbean alleges that the water pipes and electricity are lacking; and that the design details are not sufficiently specific. Zebec disagrees with the "advice" of DAM Caribbean.

129. On June 20, 2014 Zebec responded to the letter from the Port (**Exhibit 51; EXHIBIT BINDER # 2, C25**) and again asked the Port to comply. The Port was referred to the original MOU and its addenda, and the fact that these addenda only exist because the Port had not yet managed to secure the Required Approvals. The Port was also again referred to the fact that the

---

[7]   Underlining added.



agreement between the Port and Zebec referred to 3800m2 of retail space to be developed by Zebec. Purely to keep the Cruise Lines satisfied - based on a previous agreement that the Port conveniently forgot to mention - it was decided to do this in two phases. Zebec reminded the Port, moreover, of the fact that the allegedly missing documents had been in the possession of the Port for a considerable time: "*You have been provided with initial concepts of the Development Plan well in advance of the signing date of the Development Agreement. More final versions of the plan have been presented to you on several occasions after we entered into the Development Agreement proper. The Development Plans were at the basis of the Cruise Lines' approval for our Project.*

*Similarly, you have been provided with initial versions of the Construction Documents and Drawings prior to us signing the Development Agreement. Regardless, in your email from Thursday May 31, 2012, you yourself confirm that a building permit was requested and issued based on the design and drawings. The fact that you keep asking for the Construction Documents & Drawings, while you clearly have received those many times over, is frustrating and wrongful.*"

130. The so-called advice by DAM Caribbean was also discussed and refuted by Zebec. The allegations of DAM Caribbean have been independently studied and contradicted by two renowned architectural firms:

"*To test DAM's conclusions we have asked several, more experienced, architectural firms on Sint Maarten to evaluate the documents. Without fail these experts agree that these documents are 95% final for construction and that any further modifications would be dependent on the final go-ahead from you and the Cruise Lines. This is in accordance with article 2.2 of the Development Agreement by the way.*

*The so called "further deficiencies" you mention as per DAM's letter have also all been refuted:*

- *As opposed to the guesstimates from DAM concerning the various areas, our experts are of the opinion that the footprints of the currently planned buildings appear to be very similar to those specified in the original layouts as Exhibits B and E: "The writer of the letter [from DAM] seems to assume from elevation drawings that the buildings have multiple levels, whereas in fact the ground floor spaces are often double height internally, but appear as two floors on the exterior. Some of the buildings also have false levels within the roof structure, so-called mansards. It is therefore not correct to state that floor areas exceed the agreed areas in double."*

- *As for the hurricane resistance: "The writer questions the hurricane and earthquake resistance of the design, without the benefit of any calculations. The designers have indicated in the drawing package that they will be designed to 150 mph wind load and the buildings are being designed with load bearing perimeter walls and limited interior columns to provide maximum flexibility to tenants."*



- *As for the comments relating to drainage, plumbing, or electrical installations: "The writer comments that roof drainage plumbing, electrical and airco installations are missing. These would all be determined later in the process as they depend on the tenants requirements which are not yet known. The buildings are to be provided as shells to the tenants."*

- *As to the architectural details of the design: "The draft design set of drawings provided a very complete set of design features of buildings from the various design themes being used, i.e. Dutch urban, Dutch canal, French urban, French country."*

- *As for the recommendation to (further) study historical facades: "The writer recommends further studies into examples of facades, details and composition "rules" in Amsterdam or Paris. The details mentioned above show the design studies have been done already, and it is clear that in a project of this kind, historical accuracy and restoration is not the intention, but a use of features and elements that are familiar in the eyes of the viewer to give the impression of the various places being referenced.*"

For completeness, the conclusions of IXI Design N.V. and EDISISMO C.A. are submitted hereby (See: Exhibit 51; EXHIBIT BINDER # 2, C25).

131.   At the end of the letter from Zebec to the Port, Zebec highlighted the fact that the Date of Commencement as referred to in Articles 2.4 and 4.1 of the Development Agreement had not been achieved due to the culpable negligence on the part of the Port. As shown above, the only reason that the actual construction had not commenced is the fact that the Port refused to provide its formal permission without any reason. Zebec gave the Port a final deadline for compliance.

132.   On July 18, 2014 Zebec received a final letter from the Port (**Exhibit 52; EXHIBIT BINDER # 2, C26**). The Port again acted as though it knew nothing and suggested that invoking Article 4.1 of the Development Agreement on its part was reasonable. It should be clear that this is far from being the case. Subsequently, the Port again twisted the issues and suddenly asked Zebec to again provide the Development Plan and the Construction Documents and Drawings within 45 days. The Port stated that, after reviewing these documents, it would do its best to provide formal written approval within another 45 days.

133.   This last letter was the limit for Zebec. The fact that the Port continues to deny having received the required documents - despite having signed for them - and the fact that the Port continues to stall matters, mean that Zebec no longer had any confidence in the success of the Project. After all, during the construction and afterwards Zebec will need to work for a very long time intensively together with the Port and Zebec needs to be able to trust that it will comply with its commitments. To date this has not been apparent in any way.



134.   With a heavy heart, Zebec sent the Port its final letter on July 28, 2014 and Zebec declared that the Port is in default (**Exhibit 53; EXHIBIT BINDER # 2, C27**). Zebec has twice unsuccessfully given the Port a reasonable period within which to comply. Moreover, it is apparent from the letter of July 18, 2014 on the part of the Port that the Port also does not intend to comply.

**The Development Plan and the Construction Documents and Drawings**

135.   Article 2.1 of the Development Agreement states that the Developer, Zebec, will develop the Dutch Village project in accordance with a Development Plan. This Development Plan would be submitted to the Port for approval and then be added to the Development Agreement as Exhibit D.

136.   The Development Plan is submitted as **Exhibit 54 (PRJ–07a)**. Based on this Development Plan, the first version of which was submitted to the Port before the signing of the Development Agreement, talks were held with the Cruise Lines and the development of the Construction Documents and Drawings was commenced. This version dates from April 2012 and was thus provided within the deadline.

137.   The Construction Documents and Drawings are submitted as **Exhibit 55 (PRJ-10)**. This set of drawings and documents was created by ITEC Entertainment Corporation. This book is also the set of drawings and documents that was assessed by DAM Caribbean and found to be wanting. As has already been demonstrated above, this view is by no means shared by other architectural firms on Sint Maarten.

138.   On the part of Zebec there is the suspicion that DAM Caribbean was influenced by the wishes of the Port when issuing its so-called advice. The Port is by far the largest client of DAM Caribbean. This assumption on the part of Zebec is strengthened when the Construction Documents and Drawings of the Dutch Village project are compared to the plans for the so-called Satellite Shops in the Cruise Terminal, which were developed by DAM Caribbean. These drawings are presented here as **Exhibit 56**.

139.   The Satellite Shops are a number of shops that have recently been built in the cruise terminal on Sint Maarten by the Port. These shops compete directly with the shops that should have been built in the Dutch Village project by Zebec. While the Port has thus far always refused to provide formal permission to Zebec, these shops have been rapidly developed and built. What is striking is that the drawings for these submitted as Exhibit 60 are much less extensive and detailed than the Construction Documents and Drawings for the Dutch Village project. As an aside, Zebec does not understand how DAM Caribbean dares to consider the Construction Documents and Drawings as insufficient and its own less detailed documents as sufficient.



140. What is most distressing about the Satellite Shops for Zebec is the fact that the potential lessees of Zebec in the Dutch Village project, which it was forced to let go due to (a) the sudden reduction in available surface area and (b) the delay in the approval of the Port, now lease retail space in these Satellite Shops. The Port knew that these lessees/retailers were interested in retail space in the cruise terminal because these lessees/retailers were attracted by Zebec to the Dutch Village project.

141. It would appear that the Port wants to get rid of Zebec in order to develop the Project in full itself. This is evident among other things from the fact that the Port was still very positive about the Dutch Village project to the FCCA at the end of 2013. In the glossy published to mark the 20th FCCA Conference in Cartagena, Colombia, on the two pages dedicated to Sint Maarten the Port flaunted the Dutch Village project:

"*Visitors can look forward to a totally new experience as the result of SMHG's innovative move to bring a bit of Dutch flavor back to Sint Maarten. One of the common observations from visitors was the lack of a Dutch atmosphere. To right that, the port group plans to develop a so-called Dutch Village, a new attraction to be built next to the cruise ship piers on land reclaimed during construction of the second pier.*

*While final decisions on the actual facilities await, the intention is to create an area of traditional Dutch buildings, such as a windmill and church—perhaps alongside a French area—to represent the dual-nation character of the island, as well as restaurants and high-end retail outlets. In addition, there will be a pool area with water features and bars. Located on a 14,000-square-meter site, the proposed village would represent an investment of USD40 million.*"

The relevant pages of this glossy are submitted as **Exhibit 57 (EXHIBIT BINDER #2, A5)**.[8]

**The claim**

142. Based on the extensive findings of the facts, Zebec is asking Your Court to dissolve all the agreements between Zebec on the one hand and the Port on the other, to order the Port to cooperate with the restoring of the situation that existed prior to the conclusion of the agreements, and to sentence the Port to pay compensation for the damages that have arisen as a consequence of its attributable failure.

143. Under Article 6:285, paragraph 1, Dutch Civil Code, any failure in the fulfilment of one of the obligations under an agreement shall constitute grounds for the dissolution of that agreement, unless this failure, in view of its special nature or minor significance, does not justify this dissolution and the consequences of such (see also Supreme Court 31 December 1993, NJ 1994, 317). It is not necessary for there to have been a serious or material failure (Supreme Court 27 November 1998, NJ 1999, 197).

---

8   The entire publication is available on the internet via www.f-cca.com or issuu.com/fcca/docs/2013_fcca_20th.



144. In this case, however, there definitely has been a serious and material failure. The refusal of the Port to give the necessary official permission pursuant to article 2.2 of the Development Agreement has made it impossible for the entire Project to go ahead. In light of the time and effort that Zebec has put into the Dutch Village Project up until now, this failure is by no means a minor failure.

145. The defense on the side of the Port will probably be that in its letter of 18 July 2014 it offered Zebec the possibility of fulfilment. This argument, however, cannot be used by the Port. It has been shown that Zebec satisfied all its obligations, and that only the purely formal written permission of the Port, in accordance with article 2.2 of the Development Agreement, was lacking. The Port was also issued with a demand for fulfilment on several occasions without success prior to this letter.

146. Zebec should not be expected to have continued to play along with the game of the Port. As is clear from exhibits 58 and 59 above, the Development Plan and the Construction Documents and Drawings comprise an enormous pile of documents. They have been reduced to a more convenient paper format for these proceedings, but are normally much larger. Considerable costs are involved in the reproduction of these documents. Since it is quite obvious that the Port already has these documents – it signed for the receipt of such, and was able to give a complete set to DAM Caribbean so it could study such – Zebec does not see why it should now have to hand over another set.

147. It is also absurd that the Port has stated that it wants to study everything first once more before it takes another 45 days to decide whether to give its approval for such. From the exhibits that Zebec has submitted it is clear that in any case Phase I of the Project had been finalized at a much earlier stage, and that only the purely formal permission was lacking. In light of the attitude of the Port, Zebec has good reason to fear that the Port will not undertake fulfilment even if it does get another pile of documents.

148. It is moreover significant that the Port has not stated at any time what it is missing in the submitted documents. The Port has not given any explanation whatsoever of what the deficiencies are of which document, or why. Apart from the "advice" of DAM Caribbean, moreover, the Port has not consulted a single expert or consultant.

149. For the sake of clarity, it should be reiterated here that due to the attitude of the Port, Zebec has no confidence whatsoever in the further collaboration of the Port. Even if the Port should now as yet give its formal approval in accordance with article 2.2 of the Development Agreement, it is still doubtful whether or not the contractors and the workers of Zebec will actually be given access to the construction site. Zebec also has no confidence that the Port will actually cooperate with the connection of utilities, or that the Port will actually pay its share



for the construction of the supporting infrastructure (in accordance with article 2.12 of the Development Agreement). In any case, Zebec can probably forget about any expansion of Phase I into Phase II, even though this was the basis of the original agreement between the parties.

150. In light of the foregoing, the (justifiable) expectation exists on the part of Zebec that if it actually completed the construction of the project – and thus financed it for 100% – it would eventually be left with empty buildings and an enormous debt because the cooperation and the goodwill of the Port is essential for the successful exploitation of the Project as a whole.

151. Another possible defense on the side of the Port could be that the Construction Documents and Drawings are not 100% complete to the extent that a contractor could use them as they are to build the project. This is not true. The Construction Documents and Drawings that were presented in October 2013 (and then again in May 2014) are completely ready to be used by a contractor for the construction of the Project. With the exception of a few possible surprises (since a site inspection has not taken place yet), all the drawings are finished. Furthermore, the development of such a large-scale project is generally a "work in progress", whereby changes often still have to be implemented at the last moment. This cannot, and should not, be used as a reason for a refusal to give the formal permission.

152. It should also be pointed out that it was always the intention that Zebec would lease a so-called "grey box" to its future store owners: an empty shell, the inside of which would have to be finished off by the lessees themselves. The plans for the interior works were to be provided by the future lessees, and were never supposed to be provided by Zebec. However, this does not mean that the buildings themselves cannot be completed.

153. For the sake of clarity it should also be pointed out that all the construction documents and drawings that could have been finalized up until now, have also actually been finalized. These specific technical drawings, however, do **not** form a part of the Development Plan or the Construction Documents and Drawings as defined in the Development Agreement. As proof that they actually exist, they have been filed with civil-law notary Boekhoudt (**exhibit 58; EXHIBIT BINDER #2, C28**). It was decided to do this because in principle they are confidential documents that ought not to be made public via these proceedings.

154. With these detailed (and extremely expensive) drawings, it would be possible for the Port or any other developer to build the Project of Zebec very easily and cheaply.

155. It would also have been logical, if the Port was actually of the opinion that the Construction Documents and Drawings are not 100% complete, to explain in what way they are supposedly



not complete. In practice, the Port has done nothing more than cite the incorrect remark made by DAM Caribbean that the drawings were supposedly "not issued for construction".

**Liability of director Mark Mingo**

156. Mingo has been the sole director under the articles of association of the Port since November 13, 2002, and he moreover holds the position of Chief Executive Officer (CEO) of the Harbor Group of Companies. As such, he is in fact the managing director of the entire port authority. In this case, Mingo is also being held personally liable, in addition to the company (the Port) itself, for the damages of Zebec.

157. In the Tax Department/Roelofsen ruling[9], the two criteria concerning external directors' and officers' liability towards third parties are clearly explained:

- the director acted on behalf of the company, whereby the accepted criterion is that personal liability of the director of the company can be assumed if at the time the transaction was undertaken the director already knew, or should have known, that the company would not be able to fulfil the transaction, and would not offer any recovery for the damages caused by that breach of contract (the so-called "Beklamel norm");
- the director has effected or permitted that the company did not fulfil its statutory or contractual obligations, whereby the applicable criterion is that the director can be held liable for the damages of the creditor if the acts or omissions of the relevant director with respect to the creditor in the given circumstances were negligent to the extent that serious personal blame can be attributed to him.

158. Mingo can be blamed for first entering into an agreement with Zebec on behalf of the company for the development of a project of 14000 m$^2$ even though he knew that the company would not be able to fulfil that agreement because an earlier agreement with RCCL prohibited such a (large-scale) development (see exhibit 18; EXHIBIT BINDER #2, B18).

159. As soon as it was confronted with these facts, Zebec was then entitled to take court action against both the Port and Mingo on the grounds of breach of contract. But in the interests of all the parties, Zebec decided to have the Project redesigned so that it would meet the requirements of the Cruise Lines, and so that the Project could still go ahead in a scaled-down form. Considerable expenditure was necessary for this, which Zebec carried itself. In such a situation caused by Mingo, who - it should be pointed out - had already caused considerable damages for Zebec by then, Mingo could have been expected to personally make sure that the development of the Project could go ahead in an amended form without further obstacles. However, quite the opposite is true.

---

[9]   Supreme Court 8 December 2006, JOR 2007, 38.



160.  Mingo – whether or not under the influence of others – once more effected or permitted that the Port did not fulfil the new contractual obligations either by continually making new and additional demands, and also by actually denying Gioia access to the port in order to undertake the necessary preparations for the construction of the Project. As has already been explained above, it was already unreasonable for the Port to refuse formal permission (in accordance with article 2.2 of the Development Agreement) back in October 2013.

161.  The above blame principally results in personal liability for Mingo on the grounds that he first entered into an agreement with Zebec as the executive director on behalf of the company, even though he knew (or in any case ought to have known) that the company would not be able to fulfil that agreement. The earlier agreement between the Port and RCCL made this impossible. Thereafter, Mingo effected or permitted that the Port once more did not fulfil its new contractual obligations towards Zebec, despite the efforts of Zebec to make fulfilment by the Port possible at all. In this, sufficiently serious blame can be (personally) attributed to him.

162.  There is also the question of whether or not the Port can actually offer recovery for the damages caused by the breach of contract. The Port is a large company as defined in Article 2:119 of the Dutch Civil Code, and on the grounds of Article 2:120 of the Dutch Civil Code it must prepare financial statements with an auditor's report within 6 months after the end of each financial year, which under Article 2:122 of the Dutch Civil Code must be deposited for a period of two years at the offices of the Port so that interested parties can inspect such and also obtain a copy of such at cost price. A notification of this deposit must be filed with the Commercial Register (pursuant to article 24 of the Commercial Register Decree). As an alternative, the company may file the documents with the Commercial Register for public inspection.

163.  The Commercial Register has confirmed that the Port (or the entire Harbour Group of Companies) did not file a notification with the Commercial Register of the deposit of its financial statements at the offices of the company. Nor were these financial statements filed with the Commercial Register. Consequently, Mingo has violated a serious statutory obligation, which constitutes a crime in the sense of article 24 of the Commercial Register Ordinance (maximum fine of NAF 50,000). It also constitutes improper management in the sense of Article 2:14 of the Dutch Civil Code.

164.  As a party that clearly has an interest in the inspection of the financial statements, Zebec has asked the Port to be allowed to see and/or receive a copy of the financial statements for 2011, 2012, and 2013 (which should have been ready as of 15 July 2014) (**exhibit 59; EXHIBIT BINDER #2, C29**). Up until the present day, no answer has been received to this request, so that it is not clear if the Port will be able to offer any recovery at all. In all probability, in



accordance with article 436a of the Dutch Code of Civil Procedure, its immovable property and rights will have to be deemed as designated for public service.

165. Alternatively, the liability of Mingo follows because serious blame can be attributed to him personally on account of the wrongful acts and omissions of the company. Serious blame is said to exist if the director should have prevented the acts or omissions of the company in connection with the obvious interests of the injured party, according to the ruling of the Supreme Court in its judgment of 23 November 2012 (*Van de Riet/Hoffman et al.*)[10]

166. Under the circumstances of the case that have been outlined here, Mingo could have been expected to make a considerable effort to ensure that the acts or omissions of the Port would be commensurate with the interests of Zebec, and that he, Mingo, would ultimately give Zebec the permission to actually start work on the Project. All the more since the Port (in other words, Mingo) had put itself in an impossible contractual position, and it was only thanks to the lenient attitude of Zebec that the Port was in a position to fulfil its obligations towards both the Cruise Lines and Zebec (and the Indian Merchants) without compromising itself.

**Damages**

167. Zebec is demanding full compensation for all its damages. These damages consist of the costs that have been incurred by Zebec up until now in relation to the design of the Dutch Harbour Village project, and the loss of earnings that Zebec has suffered due to the imputable actions of the Port.

168. The costs that Zebec has incurred up until now in relation to the Project have been calculated at USD 5.5 million (**exhibit 60; EXHIBIT BINDER #2, A6**). This amount is made up amongst other things of the cost of the drawings (including the numerous modifications), the various commissions that had to be paid, the payable interest on loans, marketing, etc.

169. It should be pointed out that this does not include the legal fees for the period since the signing of the original MoU in September 2010, nor the costs associated with having the sub-lease deed executed twice again.

170. Pursuant to Article 6:96 of the Dutch Civil Code, Zebec is also claiming the loss of profits as damages that have arisen out of the failure to perform on the part of the Port. The total loss of profits has been calculated by Integrated Asset Management (IAM) at USD 101,908,231 (one hundred and one million, nine hundred and eight thousand, and two hundred and thirty-one US dollars) (**exhibit 61; EXHIBIT BINDER #2, A7**).

---

[10] Supreme Court 23 November 2012, NJ 2013/302, NJB 2012/2477, RvdW 2012/1473 (*Van de Riet/Hoffman et al.*); See also Supreme Court 8 December 2006, JOR 2007, 38 (*Tax Department/Roelofsen*).



171. This calculation only takes into account Phase I of the Project, 1000m2 retail space plus the floor space for Food & Beverage. If Phase II were to be included in the calculation, this amount would be at least three times higher. This is based on a project term of 50 years, consisting of the original "Lease Term" and the "Option Term" in accordance with article 4 of the Sub-Lease. Any revenues from the exploitation of the entertainment possibilities (such as the lazy river) have not been included.

172. We refer to EXHIBIT BINDER #4, which contains the lease agreements with the future lessees of the Project that are currently still in force. Zebec has concluded agreements with among others International Liquors and Tobacco Trading Ltd N.V., Authentic Gallery N.V., and Shipwreck Shops N.V. An annual rental price has been agreed with Shipwreck Shops N.V., for example (EXHIBIT BINDER #4, TAB 6), of a minimum of USD 242,000 for an initial term of 10 years.

173. In addition to the above-mentioned loss items, Zebec also has a considerable number of future loss items that are likewise a direct consequence of the actions of the Port and/or Mingo. The lessees referred to above, for example, have had to incur costs in connection with the development and fitting out of their individual units. As pointed out earlier, Zebec would only rent an empty shell to them, which they then had to complete themselves. The lessees had to engage their own architects to draw up (construction) drawings, and it is to be expected that they will take action to recover these costs from Zebec at some time in the future. Because the Port attributably failed towards Zebec, Zebec is now unable to fulfil its agreements with the lessees. These lessees will also be claiming back the deposits that they have already paid.

174. Furthermore, Zebec is expecting similar claims from a number of former lessees in relation to the costs they have incurred. In addition to the Letters of Intent of potential future lessees, EXHIBIT BINDER #3 also contains the agreements with lessees that have since been ended. This concerns the possible lessees who terminated their agreements because of the extremely long delays, or because the reduction in floor surface area meant the units no longer met their requirements. These lessees have also incurred costs, and will also try to recover them from Zebec.

175. In order to establish the amount of this latter damage item, Zebec is asking for referral to follow-up proceedings for the determination of damages.

### Evidence

176. Insofar as a burden of proof lies with Zebec on the grounds of article 129 of the Dutch Code of Civil Procedure, it offers to provide evidence to prove all its arguments insofar as disputed by the defendant. Zebec refers in this connection first and foremost to the documents cited



above as exhibits in this application. Furthermore, Zebec offers, without voluntarily assuming the burden of proof, to prove all its arguments by all legal means, in particular by the hearing of witnesses.

177.  Such to include, but not limited to, the following witnesses:
- Mr. Mark Mingo, the CEO of the Port;
- Mr. Joseph Richardson, former board member of the Port;
- Mr. Humprey Mezas, board member of the Port;
- Mr. Renald Williams, board member of the Port;
- Mr. Theo Heyliger, member of parliament, former Minister, and shareholder representative;
- Mr. Romeo Pantophlet, former Minister of Tourism, and shareholder representative;
- Mr. Luis Gioia, director of Zebec;
- Mr. Angel Gioia, director of Zebec;
- The architects of KERN Architecten B.V.;[1]
- The architects of ITEC Entertainment Corporation;
- Mr. David Candib, vice-president of Carnival Corporation & Plc;
- Mr. John Tercek, vice-president of Royal Caribbean Cruises Ltd;

**THEREFORE** may it please Your Court in a judgment enforceable with immediate effect:
A.  to dissolve the agreements between the plaintiffs and the defendant under 1;
B.  to order the defendant under 1 to cooperate with the reversal of the legal consequences of the agreements;
C.  to jointly and severally sentence the defendants under 1 and 2 to pay to the plaintiffs, such that if one makes payment the other shall be discharged, against proper proof of payment, an amount of USD 107,443,793, to be increased by the statutory interest on such from the date of submission of this application up until the date of payment in full;
D.  to jointly and severally sentence the defendants under 1 and 2 to pay to the plaintiffs, such that if one makes payment the other shall be discharged, against proper proof of payment, all damages that are reasonably the consequence of the imputable actions of the defendants, such as assessed by the Court and to be settled in accordance with the law;
E.  to jointly and severally sentence the defendants, such that if one makes payment the other shall be discharged, to pay the costs of these proceedings, plus the statutory interest on such from the date of the judgment to be pronounced in this case up until the date of payment in full.

Sint Maarten, 20 August 2014

---

[1] http://www.kernarchitecten.com/nl/projecten/shopping-leisure/dutch-harbour-sint-maarten/15/



The attorneys,

W.J. Nelissen and J. Veen

